R. S. NOONAN, INC., etc.

v.

MORRISON–KNUDSEN COMPANY, INC., et al.

Civ. A. Nos. 80–2280, 80–2281.

United States District Court, E. D. Louisiana.

Oct. 2, 1981.

Brian G. Corgan, Atlanta, Ga., David E. Walker, New Orleans, La., for plaintiff.

Herschel L. Abbott, Jr., New Orleans, La., Charles W. Franklin, Baton Rouge, La., Wm. A. Porteous, III, New Orleans, La., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DAMAGES

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. Plaintiff, R. S. Noonan, Inc. (hereinafter, "Noonan"), is a Pennsylvania corporation having its principal place of business in that state.

2. Defendant, General Motors Corporation (hereinafter, "GM"), is a Delaware corporation having its principal place of business in Michigan.

3. Defendant, Morrison-Knudsen Company, Inc. (hereinafter, "M–K"), is a Delaware corporation having its principal place of business in Idaho.

4. Defendant, Potashnick Construction, Inc. (hereinafter, "Potashnick"), is a Missouri corporation having its principal place of business in that state.

5. GM is a party to this action in two capacities. On the one hand, GM's Assembly Division (GMAD) was the "owner" for whom a major assembly facility, which forms the basis of this action, was constructed in Shreveport, Louisiana. At the same time, GM's Engineering and Construction (PE&C) division served as architect/engineer for the project. GMAD, as owner, had direct control of all project expenditures and entertained, approved and disapproved all contract awards and change order expenditures executed by its agent, M–K. PE&C, as project architect/engineer, designed the entire assembly facility, drafted the project specifications and developed the bid packages which were ultimately put out for bidding by its agent, M–K. Both entities maintained a full on-site staff which participated in the daily operations on the project, including administrative decisions concerning scheduling, site preparation, access, laydown, parking and various expenditures as well as design-related problems, changes and ongoing work.

6. GM, through GMAD, contracted with M–K in August, 1977, for the latter to act as construction manager for the assembly facility. Pursuant to this contract, M–K was to coordinate with and advise PE&C with respect to various aspects of the design phase. In addition to reviewing the design of PE&C, M–K was to draft proposed bidder lists for GM, solicit bidders for GM, prepare bid packages, conduct pre-award investigations and orientations and, thereafter, award contracts as agent for GM. Additionally, M–K obligated itself to devise a work schedule to be included in each of GM's bid packages and contracts. Finally, throughout performance, M–K acted as an intermediary between GM and the many contractors involved in the project to ensure communication between them.

7. Between June and September, 1978, Noonan entered into four agreements to perform certain portions of the work necessary to construct GM's assembly plant. In the first agreement, Noonan contracted with M–K to perform the Phase-I Structural Concrete bid package (Contract No. 2843–09). Pursuant to this contract, Noonan was to form and pour floor slabs and footers, interior and exterior walls and grade beams, piers, walls, pits and trenches and trainwells as specified. The bulk of the Phase-I Structural Concrete work was performed in the "plenum" area. Additionally, Noonan was required to perform fine grading and backfill operations attendant to the performance of the structural concrete work.

8. In Noonan's second agreement to perform work at the GM facility, Noonan contracted with M–K to perform the Phase-II Structural Concrete bid package (Contract No. 2843–20). This work basically consisted of structural concrete work in the upper level of the plenum including the upper slab of the paint plenum and the exhaust and sludge building portions of the plant.

9. Noonan's third agreement stems from a significant contract which was awarded to Potashnick for site concrete work at the GM plant. Potashnick, in turn, subcontracted with Noonan to provide labor and materials for certain portions of the work required by Potashnick's site concrete contract. Pursuant to its subcontract, Noonan was to form and pour site concrete roadways, curbs, gutters, headwalls, light standards and concrete for the construction of the retention pond. Noonan was also to form and pour drainage and interceptor basin structures as well as junction chambers where the storm drains were to tie together.

10. Noonan's fourth agreement was entered into with M–K to perform the Powerhouse Foundation Work bid package (Contract No. 2843–43). Noonan's work, pursuant to this contract, encompassed the performance of foundation work under the piping bridge connecting the powerhouse to the main building as well as foundations for circular tanks and utility trenches with attendant underground mechanical and electrical work for the Powerhouse Waste Treatment Building and tank area. Additionally, Noonan was required to pour the slab on grade at the Powerhouse.

11. As an important part of each of the above described contracts, defendants M–K and GM included a "milestone" schedule setting forth dates on which various segments of each contract were to be undertaken and, thereafter, completed. When Noonan bid and contracted for these three contracts and one subcontract, it was informed that work areas would be made available on dates set forth in the contract milestone schedules in such manner as to permit Noonan to meet the milestone dates using the labor force and equipment and construction methods mutually contemplated.

12. The first Noonan project, Phase I, was scheduled to begin in the beginning of June, 1978, but actually was begun by Noonan in the end of June, 1978. Thereafter, problems were encountered that prevented Noonan from completing its work according to schedule.

13. Commencing in November, 1978, and lasting until May, 1979, the project site was subjected to unprecedented rainfall. In the aggregate for the months involved, the rainfall was approximately 45% over the norm. There were eighty "rain days" instead of the normal sixty-two; fifty-three inches of rain fell instead of the expected thirty inches.

14. The abnormal weather during this seven-month period inevitably impeded the performance of Noonan's outdoor, subground and ground level work which involved moving workers and materials over the site, excavating, pouring concrete, building· and connecting drainage systems and completing the myriad of other tasks essential to its part of the construction of a major industrial plant. However, the severe weather was only one of several factors which combined to impede Noonan's progress on each of its four projects.

15. A second contributing factor was that the 400-acre site upon which the GM assembly plant was situated was, in its natural configuration, relatively flat land with almost no natural slope. As a result of cut and fill operations undertaken by Potashnick, the site was, according to plan, rendered even more completely flat and, for all practical purposes, had no natural drainage.

16. Defendants did not provide a satisfactory temporary drainage system to remove surface water from the site. Although drainage ditches were cut around the perimeter of the 400-acre site to intercept off-site runoff, there was little or no temporary ditching or drainage provided for the runoff of on-site surface water in the areas where Noonan was performing its work, other than that which was temporarily provided by each individual contractor. Noonan was required to continuously pump water and remove muck from its work areas while pouring additional amounts of concrete, or take other costly action, to fill the voids where otherwise stable surface material would ordinarily have been located. To accomplish this, Noonan used more materials and equipment and added extra crews to work longer hours.

17. Because of inadequate drainage compounded by the heavy rainfall, the flat site became—for considerable periods of time—a muddy, mucky quagmire. Ongoing orderly construction activity as contemplated by the parties became increasingly difficult and costly.

18. Noonan was only one of several contractors who had contracted to perform construction work at the GM assembly facility in Shreveport. Thus, Noonan's difficulties with the abnormal weather and the wet, muddy site were shared by other contractors. However, certain significant problems became unique to Noonan. The work Noonan contracted to perform was, by its nature, situated mostly at ground level or below; such as, for example, in the plenum area. Because of this, Noonan found itself confronted by not only its own drainage problems, but, by force of gravity and the emergency measures often taken, those of many of the other contractors. The heavy rainfall and the overall drainage problems caused several of the other contractors to temporarily utilize the partially constructed storm drains and other Noonan excavations for emergency drainage purposes. Thus, additional large quantities of

water and mud found their way into the existing drain lines and other below-ground-level, partially-completed structures and, thereby, materially hampered Noonan's progress. These partially-constructed storm drains and other excavations were not able, at that stage of construction, to handle the large volumes of water and mud being pumped from other contractors' sites.

19. Defendants GM and M–K were aware that the collected rainwater was, in some instances, being pumped or dumped onto or into Noonan's work sites. They not only permitted other contractors to utilize the inadequate storm drain basins and other Noonan excavations, but, in some instances, approved of—at least by implication—other contractors' pumping into these areas of Noonan's principal work activity. At one period of time, the plenum excavation was under two feet of water as a combined result of the rain and these actions. By acquiescing in the overuse of the storm drain basins and other Noonan areas of excavation for emergency drainage, defendants aggravated the problems which were already uniquely affecting Noonan.

20. Satisfactory site drainage measures were not fully implemented until November, 1979.

21. A further complicating factor which compounded Noonan's problems in meeting its schedule was lack of access to and around the worksite. Article 52 of the General Conditions of the contracts and subcontract which partially form the basis of this litigation provide that "(t)he Construction Manager shall arrange for the provision and maintenance of temporary roads, ramps, etc., as required" and that "(t)he Owner's existing roads may be used by this Contractor in cooperation with other contractors. . . . "

22. Until February, 1979, M–K and GM provided access to the site by way of an access road which required continuous blading which, in turn, caused the surface elevation of the access road to fall below the elevation of the site, causing the road to function poorly. This exacerbated the increasingly deteriorating access problem.

Though the previously noted heavy rains hindered the maintenance of the road, even during periods of good weather the road was not fully capable of supporting the heavy construction traffic necessary on the site.

23. Thus, in order to overcome these access problems, Noonan was obliged, at times, to pull its trucks, equipment and materials across the muddy site with bulldozers and other tracked vehicles. Some delivery trucks refused to attempt to negotiate the site.

24. By February, 1979, defendants began constructing additional access roads and by April, 1979, a viable system of access was provided.

25. The fact that parking facilities were marginal required Noonan's craft personnel to walk or be hauled from parking areas to their work sites.

26. Despite the deteriorated site conditions and the various factors impeding Noonan's progress, defendants chose not to temporarily suspend the work.

27. As a result of the combined factors noted above, Noonan did not meet the completion dates of the original schedule:

Although the original schedule provided that Phase I would be completed by the middle of October, 1978, Noonan did not substantially complete the Phase I contract until July, 1979;

The original schedule provided that Phase II would be completed by the middle of December, 1978, but Noonan did not substantially complete Phase II until August, 1979;

The original schedule provided that the site concrete work would be completed by April, 1979, but Noonan did not substantially complete the site concrete work subcontract until June, 1979;

The original schedule provided that the powerhouse foundation work would be completed by February, 1979, but Noonan did not substantially complete the powerhouse foundation work until March, 1980.

## Conclusions of Law

1. Diversity jurisdiction exists here under 28 U.S.C. § 1332.

■ 2. Noonan entered into four agreements to perform work which entailed, among other items, considerable excavation and foundation work, work involving the digging and forming of pits, trenches and drainage and basin structures. The very nature of the projects Noonan undertook presumed a substantial degree of difficulty from natural, ordinary and foreseeable occurrences such as rainy weather, unstable soil conditions, resulting mud, and, in turn, impeded access to and movement around the worksite. Thus, Noonan must bear certain economic consequences of the seven-month period of heavy rainfall. However, defendants M–K and GM must bear a portion of Noonan's losses attributable to the consequence of their oversights, miscalculations and various actions concerning the overall administration of the site.

■ 3. Noonan was not obliged to anticipate that the combination of heavy rains and inadequate drainage would result in its work areas becoming the drainage areas for the collected rainwater from the sites of the other contractors. Nor could Noonan have contemplated that defendants would essentially sanction the procedures whereby other contractors utilized the unfinished storm drain basins, the plenum excavation and other Noonan excavation sites as emergency relief for their on-site drainage problems.

4. Thus, by failing to restrict and, in some instances, by affirmatively sanctioning the use of Noonan's work areas as drainage facilities, defendants interfered with Noonan's ability to perform its contractual duties. For every additional gallon of water and muck that defendants' sanctions caused to be pumped into Noonan's work areas, Noonan had to expend that much effort and time to remove same and, thereafter, perform its work. Accordingly, defendants are responsible to plaintiff for the costs attributable to those delays and for the costs resulting from the removal of that water from Noonan's work areas.

■ 5. Defendants' obligation to provide adequate access to and around the worksites was inadequately dealt with to the extent that it contributed to and complicated Noonan's already serious problem as noted heretofore. As a result, Noonan's work became hindered to an unforeseeable extent.

## Damages

■ 1. The completion of the prolonged work under each of the agreements required Noonan to divert construction efforts to the tasks of overcoming lack of access to and around the worksite and, more drastically, the tasks of draining and pumping rainwater from its worksites. To overcome the difficulties of site access, Noonan rented more and bigger cranes than had been anticipated, as well as bulldozers and tracked vehicles better adapted to reaching and crossing the muddy worksite. Noonan also made expenditures for additional crews to operate the equipment and for supervisors to oversee the additional work. The expenditures for fuel to run the equipment, for repair and maintenance of the machinery, and for related materials increased with the length of the job. With regard to the pumping and drainage problems, Noonan incurred excessive costs for worker hours, pumps, filters, sand, miscellaneous equipment materials, and other related costs.

2. Noonan's damages must be based upon the above-mentioned costs which are reasonably attributable to the losses resulting from defendants' sanction of the use of Noonan's work areas for other contractors' drainage purposes, and the extent to which such costs were compounded by the mobility problems noted above.

3. On the basis of these factors, a dollar value must be assigned to the damages sustained by Noonan on each of the three contracts and one subcontract.

In the completion of the Phase-I Structural Concrete contract for M–K, I conclude that Noonan sustained compensable damages in the amount of $200,000.

In the completion of the Phase-II Structural Concrete contract for M–K, I conclude that Noonan sustained compensable damages in the amount of $350,000.

In the completion of the Site Concrete subcontract with Potashnick, I conclude that Noonan sustained compensable damages in the amount of $100,000.

In the completion of the Powerhouse Foundation contract for M–K, I conclude that Noonan sustained compensable damages in the amount of $100,000.

4. Accordingly, Noonan is entitled to an award for damages in the amount of $750,-000, plus legal interest from date of judicial demand, each party to pay their own costs.

Plaintiff is directed to prepare a judgment consistent with these findings.